ERIC A. NYBERG, ESQ. (Bar No. 131105)
CHRIS D. KUHNER, ESQ. (Bar No. 173291)
**KORNFIELD, NYBERG, BENDES, KUHNER & LITTLE, P.C.**
1970 Broadway, Suite 600
Oakland, California 94612
Telephone: (510) 763-1000
Facsimile: (510) 273-8669
Email: e.nyberg@kornfieldlaw.com
Email: c.kuhner@kornfieldlaw.com

Proposed Attorneys for Debtor-In-Possession

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re<br><br>NEXTSPORT, INC.,<br><br>Debtor. | Case No. 22-40569 WJL<br><br>Chapter 11<br><br>**MOTION FOR APPROVAL OF POST-PETITIONING BORROWING**<br><br>Date: TBD<br>Time: TBD<br>Ctrm: TBD |

Debtor and Debtor-In-Possession NEXTSPORT, INC. ("Debtor"), hereby moves this Court for approval of post-petitioning borrowing ("Motion") as follows:

### I.    FACTUAL BACKGROUND

1. On June 13, 2022, the Debtor filed for bankruptcy protection under Chapter 11 of Title 11 of the United States Code.

2. The Debtor intends, post-petition, to begin a new product line with the retailer Walmart called Spinner Shark PDQ ("Spinner Shark Units"). This program will generate $1,400,000 in revenue with a net revenue of $500,000 after payments of the loan described below and related expenses.

Motion for Approval of Post-Petitioning Borrowing    -1-

3. In order to fill this order, the Debtor requires access to $500,000 to pay for the costs to manufacture the Spinner Shark Units - $150,000 immediately ("First Advance") and $350,000 on or about July 16, 2022 ("Second Advance").

4. The Debtor and the proposed lender Michael Nelson have agreed to the material terms set forth in the Debtor-In-Possession Loan and Security Agreement ("DIP Loan"), a copy of which is attached as **Exhibit A** to the Motion and **Exhibit F** to the Omnibus Declaration. The DIP Loan is subject to Bankruptcy Court approval and execution of the subject loan documents. Mr. Nelson is a third party, non-insider who has provided the Debtor short term financing in the past. Prior to filing this case, the Debtor reached out and had discussions with the following lenders who showed interest in providing financing to the Debtor, but declined to provide any post-petitioning financing.

- BIZCAP
- Openroad Holdings
- Pacifica Business Advisors
- Riveron
- Legalist
- Crossroads Financial
- Sallyport Commercial Finance, LLC
- Rainstar Capital Group

5. Securing approval of the DIP Loan to deliver on the Spinner Shark Units is key to the continuation of the Debtor's business in this Chapter 11 Bankruptcy. Not only is Walmart one of the Debtor's cornerstone retailers, but this new program will also deliver net revenue of $500,000 which will help the Debtor to fund this bankruptcy case. It is time critical that the Debtor obtain the First Advance as soon as possible as the factories manufacturing the Spinner Shark Units have already demanded the initial payments be made. If there is a delay, the Debtor risks not being able to fund this program timely and will be unable to execute this valuable and necessary transaction

which will have a negative impact of the Debtor's relationship with Walmart. Furthermore, since the DIP Loan will be secured by post-petition products, existing lienholders are not harmed by this transaction.

6. Walmart has been a key customer to the Debtor since 2009, with the relationship continuing to grow. Starting in 2016, the Debtor expanded the Walmart business to include fourth quarter aisle displays. These were highly successful and have continued to expand every year reaching $5,000,000 in revenue in 2021.

7. For 2022, due to the sell-thru success in the Debtor's Scoot Racer referenced above, it was selected to be a year-round product to be placed in permanent, allocated shelf space at Walmart stores. This was extremely important as it provides the Debtor with valuable shelf space at Walmart stores. It is now critical that the Debtor deliver on time the Spinner Shark Units to Walmart to take advantage of this opportunity.

8. This year, the Debtor's program with Walmart has been reworked so that it delivers significantly higher margins. The Debtor has increased prices to absorb higher production costs, the most significant these being "freight/free on board" orders in China with Walmart picking up the freight, resulting in a significant cost savings.

Having the financing approved to be able to fill the Walmart PO's will ensure the following:

- Maintain the long-term Walmart relationship.
- Generate an additional $500,000 of net revenue.
- Help reduce seasonality of the business by having items on the shelf year-round.

9. A summary of the terms of the DIP loan are subject below:

| DIP Loan Terms | |
|---|---|
| Loan Amount | $500,000 ($150,000 First Advance (upon court approval) $350,000 Second Advance on July 16, 2022) |
| Maturity Date | October 1, 2022 |
| Prepayment Y or N | No |
| Interest Rate | 22.5% |
| Security | Lien of post-petition Spinner Shark Units and receivables related thereto and a junior blanket lien of the Debtor's prepetition assets. |

Motion for Approval of Post-Petitioning Borrowing -3-
Case: 22-40569   Doc# 8   Filed: 06/13/22   Entered: 06/13/22 18:07:14   Page 3 of 11

| Administrative Claim | An administrative claim for any unpaid portion of the DIP Loan. |
|---|---|
| Monthly Payments | None |
| Minimum Payments | None |
| Commission/Fees | None |

## II. LEGAL ARGUMENT

### A. The Court Should Authorize The Post-Petition Borrowing Under 11 U.S.C. 364(c).

Pursuant to Section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. See, e.g., *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estate).

Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

> "(c) If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable-under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

In satisfying the standards of section 364 of the Bankruptcy Code, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under sections 364(a) and (b) of the Bankruptcy Code. See, e.g., *Bray v. Shenandoah Fed. Sav. & Loan* (*In re Snowshoe Co.*), 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee had demonstrated by good faith effort that credit was not available without senior lien by unsuccessfully contacting other financial institutions in immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Instead, a debtor's efforts are to be considered on a case by case basis, particularly "[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr.

Motion for Approval of Post-Petitioning Borrowing -4-
Case: 22-40569    Doc# 8    Filed: 06/13/22    Entered: 06/13/22 18:07:14    Page 4 of 11

E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988) (the bankruptcy court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances.)

The Debtor has met the requirements under 11 U.S.C. Section 364(c). Prior to the filing of this case, the Debtor has been attempting to obtain financing to finance the Walmart purchase orders. As set forth above, the Debtor has had discussions with eight (8) potential lenders regarding financing. Other than Mr. Nelson, no other lenders were willing to provide financing to the Debtor.

The DIP Loan provides needed funding to timely deliver the Spinner Shark Units to Walmart and will provide a net revenue (after payment of the DIP Loan) of $500,000 which will help fund the bankruptcy case. The Debtor would prefer to borrow from a conventional source, but its options are limited based on its current financial structure.

Under these circumstances and based the Debtor's business judgment, the Debtor believes authorizing the Debtor entering into the DIP Loan is in the best interest of the bankruptcy estate.

**WHEREFORE**, the Debtor respectfully requests the Motion be granted authorizing the Debtor to enter into the DIP Loan.

Dated: June 13, 2022                                  Kornfield, Nyberg, Bendes, Kuhner & Little, P.C.


                                                       By:/s/ Chris D. Kuhner
                                                       (Bar No. 173291)
                                                       Attorneys for Debtor-In-Possession

# EXHIBIT A

# DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT

**THIS DEBTOR IN POSSESSION LOAN AND SECURITY AGREEMENT** (this "**Agreement**") is dated as of June , 2022 between **Michael Nelson**, an individual with the following address: _____ ("**Lender**"), and Nextsport Inc., a California corporation ("**Company**"). Subject to approval of the Bankruptcy Court in the **Company's** Chapter 11 Bankruptcy proceeding (the "**Bankruptcy Case**"), the parties agree as follows:

1) **Advances and the Loan.**

    (a) <u>Promise to Pay</u>. Company hereby unconditionally promises to pay Lender, the outstanding principal amount of all Advances, and collectively the Loan, to Borrower by Lender and accrued and unpaid interest thereon and any other amounts due hereunder as and when due in accordance with this Agreement.

    (b) <u>Available Advances</u>. Subject to the terms and conditions of this Agreement, Lender agrees to make term loans to Borrower in an aggregate principal amount of up to Five Hundred Thousand Dollars ($500,000.00) to be disbursed as follows:

    a. an amount equal to One Hundred and Fifty Thousand Dollars ($150,000.00) on the Effective Date ("**First Advance**") and
    b. the remaining amount of Three Hundred and Fifty Thousand ($350,000.00) to be disbursed on or about July 16, 2022 ("**Second Advance**" which along with the First Advance, such term loans are hereinafter referred to singly as an "**Advance**", and collectively as the "**Loan**").

    Each Advance shall be evidenced by a Secured Promissory Note in the form attached as Exhibits A and B hereto (each a "**Secured Promissory Note**") and shall be repayable as set forth in this Agreement.

2) **Repayment.** Company shall repay to Lender all Advances plus all other outstanding obligations on a quarterly basis on or before October 1, 2022 (the "**Maturity Date**").

3) **Permitted Prepayment.** Company shall have the option to prepay all, but not less than all, of the Advances, or the entire Loan amount plus all other obligations related to the Loan at any time and without penalty.

4) **Interest.** Interest on the principal amount of each Advance shall be twenty-two and a half percent (22.5%) per annum.

5) **Payments.** All payments (including prepayments) to be made by Company under this Agreement shall be made in immediately available funds in Dollars, without setoff, counterclaim, or deduction, before 12:00 p.m. Pacific time on the date when due. Payments of principal and/or interest received after 12:00 p.m. Pacific time are considered received at the opening of business on the next Business Day. When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.

6) **Grant of Security Interest.** As consideration for Lender's agreement to make the Loan to Company, Company hereby grants Lender, to secure the payment and performance in full of all the Company's obligations hereunder:(a) a continuing security interest in, and pledges to Lender, the Collateral, wherever located, whether now owned or hereafter acquired or arising, and all proceeds and accounts receivable related to such products; and (b) a continuing security interest on all remaining assets of the Company provided that such additional security interest shall be subordinate and junior to all existing secured creditors with liens on all assets of the Company.

7) **Administrative Claim.** Lender shall be entitled to an administrative claim pursuant to 11 U.S.C. Section 503 of the Bankruptcy Code in an amount equal to any unpaid portion of the Advance.

8) **Authorization to File Financing Statements.** Company hereby authorizes Lender to file financing statements, without notice to Company, with all jurisdictions deemed necessary or appropriate by Lender to perfect or protect Lender's interest or rights hereunder.

9) **Termination.** If this Agreement is terminated, Lender's lien in the Collateral shall continue until the obligations under this Agreement are repaid in full in cash. Upon payment in full in cash of the Company's obligations under this Agreement, Lender shall, at Company's sole cost and expense, terminate its security interest in the Collateral and all rights therein shall revert to Company.

10) **Insurance.** Company shall keep its business and the Collateral insured for risks and in amounts standard for companies in Company's industry and location. Insurance policies shall be in a form, with financially sound and reputable insurance companies.

11) **Events of Default.** The following shall constitute an event of default (an "**Event of Default**") under this Agreement: (a) Company fails to (a) make any payment of principal or interest on any Advances or the Loan on its due date, or within three (3) Business Days after such obligations are due and payable; or (b) Company or any Person acting for Company makes any representation, warranty, or other statement now or later in this Agreement, or in any writing delivered to Lender or to induce Lender to enter this Agreement, and such representation, warranty, or other statement is incorrect in any material respect when made.

12) **Consultation With Counsel.** Lender acknowledges that Lender has carefully read and fully understands this Agreement, and that Lender has had the opportunity to raise with the Company any questions, concerns or issues Lender may have in connection with this Agreement, or its terms. Lender further acknowledges that Lender has been advised to, and has had the opportunity, and has taken that opportunity to the extent Lender deemed appropriate and necessary, to consult legal counsel of Lender's choice in connection with this Agreement and consents to all of the terms and provisions contained herein knowingly, voluntarily and without any reservation whatsoever.

13) **No Waiver; Remedies Cumulative.** Lender's failure, at any time or times, to require strict performance by Company of any provision of this Agreement shall not waive, affect, or diminish any right of Lender thereafter to demand strict performance and compliance herewith or therewith. Lender has all rights and remedies provided under the Code, by law, or in equity.

14) **Notices.** All notices, consents, requests, approvals, demands, or other communication by any party to this Agreement must be in writing and shall be deemed to have been validly served, given, or delivered: upon transmission, when sent by electronic mail; or one (1) Business Day after deposit with a reputable overnight courier with all charges prepaid.

15) **Governing Law.** California law governs the Loan Agreement and related documents without regard to principles of conflicts of law that would require the application of the laws of another jurisdiction. Company and Lender each irrevocably and unconditionally submit to the exclusive jurisdiction of the State and Federal courts in Alameda County, California.

16) **Successors and Assigns.** This Agreement binds and is for the benefit of the successors and permitted assigns of each party. Company may not assign or transfer this Agreement or any rights or obligations under it without Lender's prior written consent (which may be granted or withheld in Lender's sole discretion) and any other attempted assignment or transfer by Company shall be null and void.

17) **Time of Essence.** Time is of the essence for the performance of all obligations in this Agreement.

18) **Severability of Provisions.** Each provision of this Agreement is severable from every other provision in determining the enforceability of any provision.

19) **Amendments in Writing; Integration.** No amendment to this Agreement shall be effective unless, and only to the extent, expressly set forth in a writing signed by each party hereto. This Agreement constitutes the complete understanding of the parties to this Agreement as to the subject matter herein.

20) **Counterparts.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, is an original, and all taken together, constitute one Agreement. Delivery of an executed signature page of this Agreement by electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.

21) **Relationship.** The relationship of the parties to this Agreement is determined solely by the provisions of this Agreement. The parties do not intend to create any agency, partnership, joint venture, trust, fiduciary or other relationship with duties or incidents different from those of parties to an arm's-length contract.

22) **Third Parties.** Nothing in this Agreement, whether express or implied, is intended to: (a) confer any benefits, rights or remedies under or by reason of this Agreement on any Persons other than the express parties to it and their respective permitted successors and assigns; (b) relieve or discharge the obligation or liability of any Person not an express party to this Agreement; or (c) give any Person not an express party to this Agreement any right of subrogation or action against any party to this Agreement.

23) **Bankruptcy Court Approval.** The Agreement is conditioned on and subject to an order being entered in the Bankruptcy Case approving the terms and conditions of the Agreement

24) **Definitions.** Capitalized terms not otherwise defined in this Agreement shall have the meanings set forth in this Section. All other terms contained in this Agreement, unless otherwise indicated, shall have the meaning provided by the Code to the extent such terms are defined therein. As used in this Agreement, the following capitalized terms have the following meanings:

"**Applicable Law**" means all applicable provisions of constitutions, laws, statutes, ordinances, rules, treaties, regulations, permits, licenses, approvals, interpretations and orders of courts or Governmental Authorities and all orders and decrees of all courts and arbitrators.

"**Business Day**" is a day other than a Saturday, Sunday or other day on which commercial Lenders in the State of California are authorized or required by law to close, except that if any determination of a "Business Day" shall relate to an FX Contract, the term "Business Day" shall be a FX Business Day.

"**Code**" is the Uniform Commercial Code, as the same may, from time to time, be enacted and in effect in the State of California; provided, that, to the extent that the Code is used to define any term herein or in any Loan Document and such term is defined differently in different Articles or Divisions of the Code, the definition of such term contained in Article or Division 9 shall govern; provided further, that in the event that, by reason of mandatory provisions of law, any or all of the attachment, perfection, or priority of, or remedies with respect to, Lender's Lien on any Collateral is governed by the Uniform Commercial Code in effect in a jurisdiction other than the State of California, the term "Code" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for purposes of the provisions thereof relating to such attachment, perfection, priority, or remedies and for purposes of definitions relating to such provisions.

"**Collateral**" consists of a senior lien on Spinner Shark Units that will be produced for the Wal-Mart Feature program starting after the Bankruptcy Case is filed upon approval of the Agreement by the Bankruptcy Court and a junior lien on the **Company's** assets.

"**Person**" is any individual, sole proprietorship, partnership, limited liability company, joint venture, company, trust, unincorporated organization, association, corporation, institution, public benefit corporation, firm, joint stock company, estate, entity or government agency.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed as of the Effective Date.

**Company: Nextsport Inc.**   **Lender: Michael Nelson**

By:   Name:
Name:

Case: 22-40569    Doc# 8    Filed: 06/13/22    Entered: 06/13/22 18:07:14    Page 9 of 11
Page 3 of 5

# EXHIBIT A
## SECURED PROMISSORY NOTE

$150,000 Advance                                                                                              June 9, 2022

FOR VALUE RECEIVED, the undersigned, Nextsport, Inc., a California corporation with offices located at 106 Linden Street, Oakland, California ("**Borrower**") HEREBY PROMISES TO PAY to the order of Michael Nelson ("**Lender**") the principal amount of One Hundred and Fifty Thousand Dollars ($150,000.00), plus interest on the aggregate unpaid principal amount of such First Advance, at the rates and in accordance with the terms of the Loan and Security Agreement dated June 9, 2022 by and among Borrower, Lender (the "**Loan Agreement**").

If not sooner paid, the entire principal amount and all accrued and unpaid interest hereunder shall be due and payable on the Maturity Date as set forth in the Loan Agreement.

Any capitalized term not otherwise defined herein shall have the meaning attributed to such term in the Loan Agreement.

Principal, interest, and all other amounts due with respect to the Loan, are payable in lawful money of the United States of America to Lender as set forth in the Loan Agreement and this Secured Promissory Note (this "**Note**").

The Loan Agreement, among other things, provides for the making of a secured Loan by Lender to Borrower and contains provisions for acceleration of the maturity hereof upon the happening of certain stated events. This Note and the obligation of Borrower to repay the unpaid principal amount of the Loan, interest on the Loan and all other amounts due Lender under the Loan Agreement is secured under the Loan Agreement.

Borrower shall pay all reasonable and documented out-of-pocket fees and expenses, including, without limitation, reasonable and documented attorneys' fees and costs, incurred by Lender in the enforcement or attempt to enforce any of Borrower's obligations hereunder not performed when due, all in accordance with the Loan Agreement.

THE TERMS OF SECTIONS 10-22 OF THE LOAN AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE.

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed by one of its officers thereunto duly authorized on the date hereof.

BORROWER: Nextsport Inc.

_____

Name:


_____

Title:

**EXHIBIT B**
**SECURED PROMISSORY NOTE**

$350,000 Advance                                                                                                    July 16, 2022

       FOR VALUE RECEIVED, the undersigned, Nextsport, Inc., a California corporation with offices located at 106 Linden Street, Oakland, California ("**Borrower**") HEREBY PROMISES TO PAY to the order of Michael Nelson ("**Lender**") the principal amount of Three Hundred and Fifty Thousand Dollars ($350,000.00), plus interest on the aggregate unpaid principal amount of such First Advance, at the rates and in accordance with the terms of the Loan and Security Agreement dated June 9, 2022 by and among Borrower, Lender (the "**Loan Agreement**").

If not sooner paid, the entire principal amount and all accrued and unpaid interest hereunder shall be due and payable on the Maturity Date as set forth in the Loan Agreement.

Any capitalized term not otherwise defined herein shall have the meaning attributed to such term in the Loan Agreement.

Principal, interest, and all other amounts due with respect to the Loan, are payable in lawful money of the United States of America to Lender as set forth in the Loan Agreement and this Secured Promissory Note (this "**Note**").

The Loan Agreement, among other things, provides for the making of a secured Loan by Lender to Borrower and contains provisions for acceleration of the maturity hereof upon the happening of certain stated events. This Note and the obligation of Borrower to repay the unpaid principal amount of the Loan, interest on the Loan and all other amounts due Lender under the Loan Agreement is secured under the Loan Agreement.

Borrower shall pay all reasonable and documented out-of-pocket fees and expenses, including, without limitation, reasonable and documented attorneys' fees and costs, incurred by Lender in the enforcement or attempt to enforce any of Borrower's obligations hereunder not performed when due, all in accordance with the Loan Agreement.

THE TERMS OF SECTIONS 10-22 OF THE LOAN AGREEMENT ARE HEREBY INCORPORATED BY REFERENCE.

IN WITNESS WHEREOF, Borrower has caused this Note to be duly executed by one of its officers thereunto duly authorized on the date hereof.

BORROWER: Nextsport Inc.

_____
Name:


_____
Title: